Joe Richard **MANDUJANO**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01–89–00804–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 20, 1990.

Rehearing Denied Nov. 29, 1990.

Juan Martinez Gonzales, Beeville, Neely C. Lewis, Bryan, for appellant.

Bill R. Turner, Michelle Esparza, Brazos Co. Dist. Attys., for appellee.

Before SAM BASS, COHEN and MIRABAL, JJ.

## OPINION

COHEN, Justice.

A jury found appellant guilty of burglary of a habitation, and the court assessed punishment of life imprisonment. In four points of error, appellant challenges: (1) the seizure of samples of his blood, saliva, head hair, and pubic hair, which he urges were taken without probable cause; (2) the admissibility of "DNA fingerprinting" or genetic marker evidence to establish his identity; (3) the sufficiency of the evidence; and (4) the trial court's refusal to grant a new trial, based on newly discovered evidence. A detailed account of the evidence is necessary.

On March 3, 1988, some time before 3:00 a.m., a man entered the victim's home and sexually assaulted her. She saw only the outline of the attacker's face. She testified the attacker had triangular-type shoulders from his neck, a potbelly, and a flat backside. His hair was parted in the middle, cut at the ears, longer in the back, and "kind of stuck up a little bit." At trial, the victim testified that, like her attacker, appellant had a flat backside and a potbelly, but his hair was different, and his shoulders were broader than she remembered.

At the direction of the police, the victim went to the hospital, where a sexual assault kit was prepared. At that time, she wore only a tank top, a sweat shirt, and sweat bottoms. She gave samples from her sweatpants, a bedsheet, a pair of panties, vaginal swabs, and blood. She was unsure then whether her attacker had an orgasm, but she testified at trial that he ejaculated. She had previously had intercourse with her boyfriend between 10:00 p.m. on March 1, 1988 and 1:00 a.m. on March 2, 1988.

The victim told the nurse who took the samples for the rape kit that her attacker was Caucasian. She told Officer Bostick, who prepared an initial offense report about the incident, that the attacker had wavy hair, was age 25, plus or minus five years, and was probably a white male. She never described her attacker as Hispanic. Appellant is Hispanic.

Richard Hernandez, who lived next door to the complainant when she was attacked, testified that he knew appellant and saw him in the vicinity of his and the victim's residences "quite a few times" before and after the assault. Hernandez said that ap-

pellant "just walked by" his house. The State introduced photos that Hernandez said accurately depicted appellant's appearance as he walked near Hernandez' house around the time of the sexual assault. The photographs show that appellant is an Hispanic male, with a pot belly, with his hair parted in the middle, with hair length between mid-ear to bottom of the ear.

On January 23, 1989, Officer Freddie Komar obtained, and the next day executed, a search warrant to seize samples of appellant's blood, saliva, head hair, and pubic hair. Appellant was in jail at that time.

Donna Stanley, a serologist, testified that appellant and the donor of the semen she tested were both blood type O secretors. Stanley acknowledged that some semen she inspected could have come from the victim's boyfriend, rather than from the attacker. The race and blood type of the boyfriend are not in evidence. However, Stanley concluded that the semen she tested was left by the attacker because 90–99% of the boyfriend's semen would have been naturally removed from the victim's body in the intervening 24 hours. Stanley testified that the secretions on the victim's panties, as well as the "jumpsuit" (sweat bottoms), were both blood type O. Evidence showed that approximately 45 percent of Hispanics are type O secretors.

Lauren Galbreath, an employee of Lifecodes Corporation, testified that she used four genetic markers for comparison of appellant's samples with the samples provided by the victim. When comparing appellant's blood to the material from the victim's sweatpants, all four genetic markers matched, with no inconsistencies. Two markers matched between appellant's blood and the vaginal swab. The other two markers from the vaginal swab were not inconsistent, but were not identifiable because of deterioration. The bedsheet stain matched two genetic markers in appellant's blood. The other two markers obtained from the genetic material on the bedsheet were not sufficient for comparison, but were not inconsistent. The crotch area of the panties did not match the genetic markers examined in appellant's blood. They

matched someone else, who had not provided a sample for comparison.

Dr. McElfresh, the assistant director of forensics and paternity at Lifecodes, testified that the scientist conducting the test, as well as three scientists with Ph.D. degrees, review the results of every genetic marker test conducted at Lifecodes. He stated that particular sections of DNA are selected because they differ from person to person. Of the four genetic markers used here, McElfresh stated that the allele frequency distribution for the North American Hispanic population, i.e., the random probability that a North American Hispanic person would have the particular genetic markers he found, were as follows: (1) once in 2963 people for the first marker; (2) once in 72 people for the second marker; (3) once in 76 people for the third marker; and (4) once in 149 people for the fourth marker. Multiplying these figures yields a statistical probability that this particular combination of genetic material would be found at random in the North American Hispanic population only once out of approximately 2.4 billion people.

McElfresh stated that four markers from the sweatpants were compared with appellant's blood, and two each from the vaginal swab and the bedsheet. McElfresh testified that Lifecodes uses the Hardy–Weinberg equilibrium equation in population statistics to determine the probability of a particular genetic makeup in the relevant population at random, and it is generally accepted in the scientific community. McElfresh testified that the allele frequency distributions used by Lifecodes had been published in a scientific journal and subjected to peer review. The Hispanic allele frequency distribution graph was compiled by researching the DNA of 151 Hispanics, which yielded 302 chromosomes for comparison.

Dr. Wild, a biochemistry professor at Texas A & M University, testified that he had reviewed five articles written by Lifecodes employees, which explained their methods in evaluating genetic population distribution, and that they seemed "very solid." He testified that Lifecodes' meth-

ods were the "best approach" and "at the cutting edge of current state of the science right now." These methods were, "without a doubt," accepted by the scientific community. From his personal interviews with Galbreath and McElfresh, Dr. Wild concluded that they were highly intelligent, experienced, and competent. In his words, "They do good science." He testified that a mistake in Lifecodes' procedures would not cause a false result, but would cause the absence of any result at all.

In his third point of error, appellant contends the evidence did not prove that he was the attacker. The standard of review is whether, viewing all the evidence in the light most favorable to the verdict, any rational jury could have found the elements of the crime beyond a reasonable doubt. *Houston v. State*, 663 S.W.2d 455, 456 (Tex. Crim. App.1984). This standard applies in both direct evidence and in circumstantial evidence cases. *Id.*

Here, the DNA test results established that appellant's combination of genetic markers would be randomly found in the North American Hispanic population only once in every 2.4 billion times. Appellant was seen by a long-time acquaintance in the victim's neighborhood "quite a few times," before and after the crime, with no explanation for his presence. His hair part, hair length, clean shaven face, and physique resembled the victim's description. Viewing all the evidence in the light most favorable to the verdict, a rational trier of fact could have found that the State proved all of the essential elements beyond a reasonable doubt.

Point of error three is overruled.

In his fourth point of error, appellant asserts the trial court erred in denying his motion for a new trial, based on newly discovered evidence.

Appellant contended the State had presented witnesses who testified that there was no controversy regarding the reliability of DNA testing, when they either knew, or should have known, about a case in New York where the reliability of the evidence was seriously questioned. Claiming that this evidence was relevant to the predicate for admissibility of DNA testing and that it was not available to appellant or his counsel, appellant's motion requested a hearing to determine whether the tests were reliable, in light of this new evidence. Attached to his motion for new trial was an article that appeared in *Time* magazine on June 5, 1989, which discussed a case in New York City, *People v. Castro*, where the prosecution sought to use DNA testing. The article stated that "[a] panel of experts from both sides eventually agreed that the evidence presented was 'not scientifically reliable enough.'" The tests in that case were performed in 1987 by Lifecodes, the same company that performed them here. The article stated that "[t]he firm insists that it has refined its methods in the past two years." The article appeared about two weeks after appellant's trial. The tests in this case were performed in 1989.

The motion for new trial was not sworn and contained no affidavits. According to the order denying a new trial, there was a hearing on the motion, but no evidence was presented; only argument of counsel was heard. No record of that hearing is before us.

A motion for new trial based on newly discovered evidence is addressed to the sound discretion of the trial judge, and absent a showing of a clear abuse of discretion, that ruling will not be disturbed on appeal. *Bolden v. State*, 634 S.W.2d 710, 711 (Tex.Crim.App. [Panel Op.] 1982); *Hernandez v. State*, 507 S.W.2d 209, 212 (Tex. Crim.App.1974). With no evidence presented at the hearing and no record of the hearing, we cannot find an abuse of discretion.

Appellant's fourth point of error is overruled.

In his second point of error, appellant contends the DNA tests should have been excluded because the State did not demonstrate the method's "general acceptance in the particular field in which it belongs." *See Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923); *Romero v. State*, 493 S.W.2d 206, 209 (Tex. Crim. App.

1973); *Lewis v. State*, 737 S.W.2d 857, 860 (Tex.App.—Houston [1st Dist.] 1987, pet. ref'd); *Jones v. State*, 716 S.W.2d 142, 145 (Tex.App.—Austin 1986, pet. ref'd). Appellant does not contend that these particular tests were improperly conducted. Rather, he contends that even properly conducted DNA tests have not earned general scientific approval that is required for them to be admissible. We disagree.

All the evidence at trial was that DNA testing is a generally accepted scientific method. There was no evidence to the contrary. Although appellant retained a scientific expert, his expert did not testify. Given this record, we hold that the trial court did not abuse its discretion in admitting the evidence. Courts in other states have held similar evidence admissible. *Cobey v. State*, 80 Md.App. 31, 43, 559 A.2d 391, 398 (Md.Ct.Spec.App.), *cert. denied*, 317 Md. 542, 565 A.2d 670 (1989); *Andrews v. State*, 533 So.2d 841, 850–51 (Fla.Dist.Ct. App.1988), *review denied*, 542 So.2d 1332 (Fla.1989); *Spencer v. Commonwealth*, 238 Va. 275, 384 S.E.2d 775, 783 & n. 10 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990); *see also People v. Castro*, 144 Misc.2d 956, 545 N.Y. S.2d 985, 987 (N.Y.Sup.Ct.1989) ("all the available legal precedents agree that DNA forensic evidence is admissible, and none have held that this evidence fails to pass the *Frye* standard").

Appellant's second point of error is overruled.

In his first point of error, appellant urges that the affidavit underlying the search warrant for his blood, hair, and saliva did not establish probable cause. He contends the affidavit was conclusory because it did not adequately describe him, and that the warrant was partly based on an illegal seizure of tennis shoes from his home, pursuant to an invalid consent form signed by his wife.

The affidavit in question was made on January 23, 1989. It contained numerous allegations that attempted to establish probable cause, including the following. The victim had been sexually assaulted on March 3, 1988, at approximately 3:00 a.m., by a clean-shaven man with dark, collar-length hair. The man was 20 to 30 years old, had a potbelly, and wore dark jeans and dark-colored shirt. After he left, it was discovered that the victim's telephone had been disconnected from the wall. On March 28, 1988, Chris King, who lived near the victim, reported that he had twice since the assault seen a suspicious-looking white pickup truck, license number 0414 ME, in the area; the truck was owned by appellant's wife. Records from the DPS lab indicated that the attacker had type O blood, the same blood type as appellant, as shown in his military records. Between June 21, 1988 and August 23, 1988, appellant was stopped by police at least four different times, each time between 12:46 a.m. and 2:45 a.m., within a short distance of the victim's home. Each time, he wore blue jeans and a dark-colored shirt. On one occasion, police spotted appellant coming out of a yard; he gave no explanation for being there. Appellant does not live in the area. Another time, appellant was seen walking out of an apartment complex. He told police that he was visiting a "friend," telling them this friend's name. The police later discovered no one by that name lived there. Between July 8, 1987 and October 20, 1988, there had been seven other sexual assaults or attempted assaults in the victim's neighborhood. The affiant stated, "Due to the description and actions of the person committing the offenses and a similarity in the victim's [sic] physical appearance, it appears these assaults are related. It is apparent the person responsible is selecting his victims and therefore must be in the area at times other than just when the assaults occur." One of the other assaults occurred on August 17, 1988, at 5:30 a.m. That victim awakened and found a man in her bed. That victim's phone was taken off the hook. That victim described the attacker as male, approximately age 30, wearing dark pants and a dark shirt, and pudgy, with a potbelly. Upon viewing appellant in a police lineup, that victim stated that appellant was the "right size," but she could not positively identify him as the attacker. Plaster casts of footprints found near that victim's bedroom window

matched appellant's right Nike tennis shoe, which police recovered when they arrested appellant on other charges. The affiant stated that appellant was 33 years old, but appeared younger. The affiant described appellant as being 5'7" tall, weighing about 170 pounds, and having dark, collar-length hair, and a potbelly. Because the examination of the victim revealed the presence of spermatazoa, the affiant requested that appellant's blood, saliva, head hair, and pubic hair be taken for comparison purposes.

At the pretrial hearing, Sergeant Hallmark testified that appellant had been stopped by Officer Senate, on March 23, 1988 at 1:40 a.m., as a suspicious person, because appellant had been seen between two houses in the area where the assaults had occurred. Appellant was wearing Nike tennis shoes, but the police released him because they could not confirm that appellant had outstanding warrants for his arrest.

At approximately 2:00 or 2:15 a.m., on August 23, 1988, Hallmark approached appellant, who was sitting on the porch at his residence. Hallmark shined his flashlight and saw that appellant was wearing Nike tennis shoes, but appellant went inside the house before Hallmark could get close to him. Hallmark went to the back yard to make sure that appellant did not try to run away. When appellant came back out of the house, he had changed his shoes. Hallmark advised appellant that the police were trying to confirm his traffic warrants. While Hallmark spoke with appellant, two other marked police cars approached the area. Because the computer was not working and they could not confirm his traffic warrants, the police left after 30 minutes. Hallmark acknowledged that the police drove by appellant's home several times within the next hours to see if he was there. He did not remember whether the police had shined spotlights on appellant's home that evening.

When the police returned at about 5:00 a.m. to execute outstanding DPS arrest warrants, appellant answered the door. After arresting appellant, Hallmark permitted him to call his bondsman. Appellant's wife was present at this time. As appellant was led away, Officers Hallmark and Senate remained on the porch, while Hallmark spoke to Mrs. Mandujano. After telling her that appellant was a suspect in several burglaries involving sexual assaults, Mrs. Mandujano said that it would be all right if the police looked for the tennis shoes. She signed a consent form, which read in pertinent part as follows:

I, Janeen Mandujano, having been requested by Sgt. Mike Hallmark # 51, Of the Bryan Police Department, to permit him and his fellow officer(s) to search my Residence For Tennis Shoes & Knife located at 2206 Echols, Bryan Tx, and described as Tennis shoes (Nike Air), Kabar Folding Knife, and having having [sic] been informed by him that I do not have to consent to such search and that I have the right to refuse to consent to such search, and, understandingly [sic] my rights, I freely and voluntairly [sic] consent to such search and give the said Sgt. Mike Hallmark and his fellow officer(s) permission to search my said Residence.

After signing the consent form, Mrs. Mandujano led the police into the bedroom, opened a closet, and pointed out the shoes.

Hallmark believed that Mrs. Mandujano voluntarily consented, stating that he was kind to her at all times. Although she asked questions, she did not seem nervous or upset. Hallmark denied telling Mrs. Mandujano that she could not post bond for appellant if she did not consent, and said he only asked once for her consent.

Appellant testified his wife was upset when he was arrested. He stated that Officer Hallmark told Mrs. Mandujano that if she did not sign the paper in his hand, appellant would not get out of jail.

Mrs. Mandujano testified that on the morning of August 23, 1988, at 5:00 or 5:30 a.m., the police surrounded her house. She was nervous, confused, scared, and threatened. She knew appellant had been in trouble before, and she feared he might be involved in something illegal again. When she signed the consent form, she thought she was signing a search warrant. She said she thought it was the right thing to

do, as well as her duty, to let the police come into her house. She admitted that she could read and understand the consent form, but still thought she was signing a search warrant. Hallmark was polite, dignified, respectful, and did not force her to let the police enter and search the house. She said that she voluntarily consented to the search of her home on August 23, 1988.

Appellant was confined in the Brazos County Jail on January 24, 1989, when the search warrant was executed and the blood, hair, and saliva were seized. He does not attack the legality of his arrest, only the legality of the search under warrant. The trial judge denied his motion to suppress.

A search warrant for evidence must be supported by probable cause:

> (1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched.

Tex.Code Crim.P.Ann. art. 18.01(c) (Vernon Supp.1990). Only the second item is disputed here. A search warrant affidavit must be read in a common sense manner, and reasonable inferences may be drawn from all the facts contained within its four corners. *Cassias v. State*, 719 S.W.2d 585, 587–88 (Tex.Crim.App.1986); *see also Eisenhauer v. State*, 754 S.W.2d 159, 164 (Tex.Crim.App.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988).

■ We first decide whether appellant's wife voluntarily consented to the August 23, 1988 search for the tennis shoes because evidence obtained in that search was used to obtain a search warrant on January 23, 1989. The State must prove by clear and convincing evidence that she consented voluntarily. *Dickey v. State*, 716 S.W.2d 499, 504 (Tex.Crim.App.1986). Whether consent was voluntary is a fact question determined by all the circumstances. *Id.* A consent is invalid if granted only in sub-

mission to a claim of lawful authority. *Id.* This Court must accept the finding of the trial court unless it is clearly erroneous.

Appellant's wife testified that Officer Hallmark was polite and courteous, and that she voluntarily consented. She testified that it was not only the police activity, but also the fact that appellant had been in trouble before, that caused her to feel nervous and threatened. Although she thought she was signing a search warrant, she testified that she had an opportunity to read and understand the consent form. She believed that signing was her duty, but she also thought it was the right thing to do. Finally, she conceded that Officer Hallmark did not force his way into the house. We hold that the trial judge did not abuse his discretion in finding that she consented voluntarily.

■ We further hold that the affidavit stated probable cause to seize appellant's hair, blood, and saliva. The affidavit stated that:

1) Appellant, like the attacker, had dark hair;

2) Appellant, like the attacker, had collar-length hair;

3) Appellant, like the attacker, had a pot belly;

4) Appellant, like the attacker, met the "general description" of the victim's attacker, from which the magistrate could infer that appellant was, like the attacker, clean shaven;

5) Appellant was repeatedly seen between 12:46 a.m. and 2:45 a.m. in the victim's neighborhood, where numerous additional sex assaults had occurred, dressed in blue jeans and a dark shirt, like the attacker; he did not live in the area; he gave a false explanation for being there;

6) Appellant's wife's truck was seen twice in the area of the assault within 3–4 weeks after the assault;

7) Appellant appeared to be the same age as the attacker appeared to be, 20–30 years old, and was, in fact, near that in age;

8) Appellant had the same blood type as the attacker;

9) Appellant's shoe print was found outside of the home of another victim, who lived near this victim, and who, like this victim, was attacked by a burglar in her home, during early morning hours. In both cases, the burglar changed the condition of the telephone.

We hold there was reasonable cause for the magistrate to believe that appellant's hair, blood, and saliva constituted evidence of this offense.

The first point of error is overruled.

The judgment is affirmed.

SAM BASS, Justice, dissenting

I respectfully dissent. While I agree with the majority's reasoning and disposition of appellant's second, third, and fourth points of error, I believe that the affidavit underlying the search warrant did not set forth sufficient facts to establish probable cause.

First of all, I would find that Mrs. Mandujano's consent was not voluntary. Other than the statements contained in the consent form, and Mrs. Mandujano's statement that she had an opportunity to read and understand it, nothing in the record indicates that Officer Hallmark advised Mrs. Mandujano of her right to decline her consent to the search.

Further, although Mrs. Mandujano testified that she voluntarily consented, the coercive aspects of the police activity giving rise to the signing of the consent form vitiate her "consent," which she gave in acquiescence to the assertion of lawful authority. Mrs. Mandujano testified that the police visited appellant's home at approximately 3:00 or 3:30 a.m., and then again at 5:00 a.m., when the police executed the arrest warrants for outstanding traffic tickets. While Officer Hallmark did not remember whether the police had shined spotlights on appellant's home that evening, both appellant and his wife testified that the police did in fact shine lights on their home. After Mrs. Mandujano was awakened by these lights shining at 3:00 a.m., she was unable to go back to sleep. Further, appellant testified that his wife was upset because she could not understand why three police officers had come to the house to arrest him for outstanding warrants on traffic tickets. While Mrs. Mandujano did testify that she had an opportunity to read and understand the contents of the consent form, and that she believed that signing the consent form was the right thing to do, she also testified that she thought she was signing a search warrant, and that it was her duty to sign it. Mrs. Mandujano's confusion as to whether she was signing a search warrant or consent form at 5:30 a.m. is understandable, especially in light of the fact that there was a considerable amount of police activity focused on her home during the early morning hours immediately preceding her "consent." I would hold that the State did not prove by clear and convincing evidence that Mrs. Mandujano's consent was voluntary. Accordingly, in determining whether the warrant is supported by probable cause, I would not consider that portion of the search warrant affidavit that discusses the Nike tennis shoes.

Secondly, I would find that the search warrant affidavit did not set forth sufficient facts to establish probable cause. While the person who sexually assaulted the complainant had physical features and a modus operandi similar to the person who assaulted the other victim specifically mentioned in the affidavit, the affidavit does not contain a sufficient number of distinguishing characteristics or incriminating facts to establish that appellant was the attacker. The other victim could not positively identify appellant at the live lineup, but merely stated that appellant was "the right size." Further, the affidavit mentioned nothing about the complainant having positively identified appellant, which was borne out by the trial testimony. It is also not particularly helpful that other sexual assaults in the area were similar to this one, and very possibly committed by the same person, as the identity of the attacker in none of the assaults was established. The mere allegation that three weeks later

appellant looked suspicious to a resident in the neighborhood was conclusory. Although appellant was present in the area on several other occasions, each of these incidents occurred between three to five months after the attack. Finally, the fact that appellant has the same blood type as the attacker (type O), is hardly a distinguishing feature, because approximately 45 percent of the Hispanic population in North America has the same blood type as the attacker (type O). Although a search warrant affidavit must be read in a common sense manner, and reasonable inferences may be drawn from all the facts contained within its four corners, *Cassias v. State*, 719 S.W.2d 585, 587–588 (Tex.Crim.App. 1986); *Williams v. State*, 699 S.W.2d 368, 370 (Tex.App.—Houston [1st Dist.] 1985, no pet.); *see also Eisenhauer v. State*, 754 S.W.2d 159, 164 (Tex.Crim.App.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988), *the mere affirmation of belief or suspicion* is insufficient to sustain the issuance of a search warrant. *Tolentino v. State*, 638 S.W.2d 499, 501 (Tex.Crim.App. [Panel Op.] 1982). While the facts set forth in the affidavit most likely rise to the level of reasonable suspicion, they fail to establish probable cause that appellant was the attacker. This would be true even considering the match between the footprints found near the other victim's home and appellant's right Nike tennis shoe, which is a common brand.

Finally, I would hold that the good faith exception to the Texas exclusionary rule does not render admissible evidence seized pursuant to a warrant that is based on an affidavit lacking in probable cause. I agree with the State that the good faith exception to the federal exclusionary rule would render the evidence admissible on federal constitutional grounds. *See United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984) (Supreme Court held suppression inappropriate where officers' good faith reliance on a warrant issued by a magistrate was objectively reasonable, even though the warrant affidavit was lacking in probable cause).

However, article 38.23(b), Tex.Code Crim. P.Ann. (Vernon Supp.1990), the good faith

exception to the Texas exclusionary rule, reads as follows:

> It is an exception to the provisions of Subsection (a) [the Texas statutory exclusionary rule] of this Article that the evidence was obtained by a law enforcement officer acting in objective good faith reliance upon a warrant issued by a neutral magistrate *based on probable cause*.

(Emphasis added.) Article 38.23 applies to our case, because appellant objected on Texas constitutional grounds, which is sufficient to invoke article 38.23. *Polk v. State*, 738 S.W.2d 274, 276 (Tex.Crim.App. 1987).

Courts of appeals in this state have treated the *Leon* good faith exception and the good faith exception under 38.23(b) as being synonymous. *See Robinson v. State*, 771 S.W.2d 710, 711–12 (Tex.App.—Corpus Christi 1989, pet. ref'd) (fruits of a search seized pursuant to a warrant were admissible, even though the parties stipulated that affidavit underlying warrant was defective because it did not state when information in the affidavit was obtained); *Young v. State*, 776 S.W.2d 673, 677–79 (Tex.App.—Amarillo 1989, no pet.) (good faith exception under *Leon* and article 38.23 permitted introduction of evidence seized pursuant to facially valid arrest warrant, where there was no evidence of any deliberate falsehoods or reckless disregard for the truth employed by the affiant in obtaining the warrant); *Curry v. State*, 780 S.W.2d 825, 826–27 (Tex.App.—Houston [14th Dist.] 1989, pet. granted) (affirmed trial court's denial of defendant's motion to suppress cocaine, seized pursuant to allegedly defective "traffic warrants"; article 38.23 good faith exception applied, even if the affidavits underlying the traffic warrants did not establish probable cause).

I recognize the defect stipulated to between the parties in *Robinson*, 771 S.W.2d at 711, the failure to mention when the affiant received information contained in the affidavit, is one that renders a warrant invalid, *Schmidt v. State*, 659 S.W.2d 420, 421 (Tex.Crim.App.1983), and would necessitate the application of the good faith ex-

ception to uphold a search pursuant to that warrant. However, I find it significant that the Court of Criminal Appeals has granted a petition for discretionary review of the *Curry* decision, in which the intermediate appellate court stated that the good faith exception of article 38.23(b) applied to warrants not supported by probable cause. 780 S.W.2d at 826–27. This fact, coupled with the Legislature's inclusion of the phrase "based on probable cause," within article 38.23(b), compels me to conclude that the good faith exception to the Texas exclusionary rule does not apply to search warrants based on affidavits lacking probable cause. Accordingly, I would hold that the trial court erred in denying appellant's motion to suppress, and that the error was harmful. Tex.R. App.P. 81(b)(2).

I would reverse the judgment of the trial court, and remand the cause for a new trial.