OPINION OF THE COURT
Arthur J. Cooperman, J.
Once again, a trial court in this State must consider the admissibility of the results of DNA (deoxyribonucleic acid) typing during the early stages of the identification test’s use in criminal cases.[1]
*109 In this case, defendant is charged with sodomy and other related crimes.
Defendant moved for omnibus relief, which included a request for a hearing pursuant to Frye v United States (293 F 1013), to determine the admissibility of DNA evidence. [2] This court granted the application, and thereafter, in a supplemental order, a hearing was ordered to determine if the testing laboratory performed scientifically accepted tests and techniques which yielded sufficiently reliable results.[3]
The testing was done by Lifecodes Corporation on matter found on a shirt worn by the complainant at the time of the occurrence that is the basis of this indictment and on a blood sample obtained from defendant.
Forensic use of DNA technology, because of its newness, has begun to occupy the attention of courts throughout the country[4] and the scientific community.[5]
*110 The evidence submitted at the hearing in this case reflected the controversy associated with forensic use of DNA typing faced by molecular biologists and geneticists, population geneticists and Judges during the last four years.
There were 15 hearing sessions held before this court. In excess of 2,000 pages of transcript were generated. The more than 80 exhibits submitted included autoradiographs, research papers, peer review articles, data sheets, charts, diagrams, slides, laboratory notes, protocols, reports, and curriculum vitae of the expert witnesses.
The witnesses for the People were Dr. W. Ted Brown, Chief of the Division of Human Genetics, North Shore Hospital, offered as an expert in human genetics and DNA analysis; Lauren Galbreath, Senior Forensic Scientist, Lifecodes Corporation (Lifecodes), offered as an expert in forensic analysis of DNA; Dr. Kevin McElfresh, Director of Identity Laboratories, Lifecodes, offered as an expert in molecular and population genetics; and Dr. Bernie Devlin, Associate Research Scientist, Yale School of Medicine, offered as an expert in population genetics and statistics.
The defense witnesses were Dr. Peter D’Eustachio, Associate Professor, Biochemistry Department, NYU Medical Center, offered as an expert in molecular biology and genetics, RFLP[6] analysis and DNA testing, and Dr. William Shields, Professor, College of Environmental Science and Forestry, State University of New York, offered as an expert in molecular and population genetics.
LEGAL STANDARD OF ADMISSIBILITY
The admissibility of novel scientific evidence is governed in New York by the rule originally set forth in Frye v United States (293 F 1013, 1014, supra): "Just when a scientific *111 principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.”
In People v Middleton (54 NY2d 42, 49), the Court of Appeals held that "the test is not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally accepted as reliable.”
When this court directed that a Frye hearing be held to determine whether scientifically accepted tests and techniques were properly performed which yielded sufficiently reliable results it adopted the following interpretation of the Frye standard consisting of three basic requirements: (1) the validity of the underlying principle, (2) the validity of the technique applying that principle, and (3) the proper application of the technique on a particular occasion, i.e., the test undertaken in a particular case before the court (see, Gianelli, Admissibility of Novel Scientific Evidence: Frye v United States, A Half Century Later, 80 Colum L Rev 1197, 1201 [1980]).
The early comprehensive DNA decision in People v Castro (144 Misc 2d 956, 959) advanced a three-prong standard "to aid in the evaluation and resolution” of the "complex issues” presented in DNA cases, as follows:
"Prong I. Is there a theory, which is generally accepted in the scientific community, which supports the conclusion that DNA forensic testing can produce reliable results?
"Prong II. Are there techniques or experiments that currently exist that are capable of producing reliable results in DNA identification and which are generally accepted in the scientific community?
"Prong III. Did the testing laboratory perform the accepted scientific techniques in analyzing the forensic samples in this particular case?”
As noted previously, and as stated by this court in its August 27, 1990 order, the DNA principle and the technique applying that principle are generally accepted in the scientific community. Therefore, this hearing was limited to determining whether the laboratory procedures employed by the test *112 ing laboratory, Lifecodes, were done properly. That, in effect, is the third requirement of the Frye and Castro standards.[7]
This court, and the Castro court, placed the emphasis of the inquiry on whether the generally accepted tests were properly performed in the case at hand as a question of admissibility, and not one that goes to the weight of the evidence.
The latter approach was adopted by the Appellate Division, Third Department, in People v Wesley (supra). This court need not follow that approach for the reasons set forth in its conclusions of law, below.
Perhaps when the DNA issue is no longer novel, and uniform testing standards have been established, a prior admissibility hearing will be unnecessary and the trier of the fact will determine the weight of this scientific evidence as with any other expert testimony.
By order dated December 3, 1991, this court expanded the parameters of the hearing for the purpose of addressing the population genetics issue as requested by defendant.
However, this presented a problem. Defendant urged that without a consideration of the second prong (i.e., the validity of the scientific technique), which presumably was prohibited by this court’s order directing a hearing on prong III only, there would be no opportunity for inquiry into whether the method and techniques used by Lifecodes to calculate the statistical significance of a match are generally accepted as reliable in the population genetics community. Defendant argued that the method and techniques used were not generally accepted.
Yet, implicit in the court’s extension of the hearing to include testimony on population genetics was the need to consider all appropriate prongs of a Frye inquiry on this aspect of DNA testing. Testimony was adduced by both sides with respect to the general acceptance in the population *113 genetics community of statistical methods to evaluate a match (prong II) and the methods utilized in this specific case (prong III). Moreover, prong III — the standard applied to this hearing —requires that the tests performed must be scientifically accepted.
In any event, the matter becomes academic for the reasons stated below in the court’s conclusions of law.
THE ISSUE
This case turns on whether there was compliance with prong III of the Frye inquiry, as directed by this court. Did Lifecodes perform scientifically accepted tests and techniques which yielded sufficiently reliable results?
Specifically, this court must determine whether the results of DNA testing in this case are admissible at trial, given the fact that the phenomenon of band shifting occurred during the process and that Lifecodes used monomorphic probes to correct for the band shift.
There is no reported decision in this State that deals with this subject.
THE CONTENTIONS
It is the People’s position, in support of their contention that this court should find in the affirmative, (1) that Life-codes’ use of monomorphic probes is a generally accepted procedure within the scientific community, specifically when analyzing band shift in forensic DNA analysis; (2) that there is sufficient endorsement within the scientific community of the use of monomorphic probes for band shift corrections; and (3) that there is significant support in the relevant scientific communities for the methodology employed by Lifecodes to calculate pattern probabilities.
Defendant contends, to the contrary, (1) that Lifecodes’ method of correcting for band shifting with monomorphic probes is not generally accepted; (2) that, in any event, Life-codes did not follow its own method in this case; (3) that the failure of the control pattern for a monomorphic probe used by Lifecodes precludes using any data it generated, and without this probe to correct for band shift a match cannot be claimed; (4) that Lifecodes’ method for calculating a statistical estimate is not generally accepted because there was no consideration of subpopulations within racial groups; and (5) that without proof of a reasonable estimate of Lifecodes’ *114 laboratory error rate based upon blind proficiency testing, the statistical estimates here should not be admitted into evidence.
THE HEARING
Ms. Galbreath was the forensic scientist who performed the laboratory tests and prepared the report for Lifecodes in this case. She testified regarding the protocol Lifecodes employs in declaring a match. She explained that in order to call a system a match, the bands in the evidence and suspect lanes must fall within 1.8% of each other. Due to differences in the way the gel is run in each sample, there are usually migrational differences. If the bands do not fall within the 1.8% match window, monomorphic probes are utilized to correct for band shift. When a monomorphic probe is employed, the bands should fall in known locations because the loci are the same in every person’s DNA. Consequently, the monomorphic probe may be used to calculate for any deviations.
Ms. Galbreath testified that there was a match here and that although there were differences in the results from defendant’s blood and the evidence sample, monomorphic probes were run and they corrected for the shift. She could not determine visually if the bands in the respective lanes fell within 1.8% of each other. However, they exhibited a banding pattern match.
There was some variation in this witness’ testimony regarding which probe is to be used to correct for presumed band shift. Originally, she testified that according to Lifecodes’ protocol the monomorphic probe closest to the diagnostic probe in question must be used for the correction. She later testified that this rule is not absolute and that other monomorphic probes may be utilized.
Dr. Brown, the People’s outside expert, testified that he performs the same techniques in isolating DNA in his diagnostic work as Lifecodes does in forensic testing.
He reviewed the lab work and findings in this case. The autorads were of "high quality, state of the art.” He observed bands lined up similarly, but not in the same position.
Dr. Brown testified that there was a "satisfying impression of a match” here but because of band shift, corrections had to be made to get back into the 1.8% match window by using monomorphic probes. The band shift was visualized on the autorads by a consistent shift in the suspect and evidence *115 lanes, that is, the differences between the bands in each lane were consistent with each other in a given region of the gel. When bands line up similarly, but not in the same place, i.e., a consistent shift, it may be because of the amount of sample on the gel or its position on the gel. One part of the gel may run faster or physical changes may have occurred (environmental insults).
When there is this consistent migration difference, Life-codes’ procedure is to use monomorphic probes to get back into the 1.8% match window, which was done here.
Dr. Brown was of the impression that Lifecodes used the monomorphic probe closest to the diagnostic probe to correct for band shift. Using Lifecodes’ methods of calculating a match he conceded that two bands were outside Lifecodes’ quantitative match rule of 1.8%.
Dr. McElfresh testified that it was his responsibility to oversee case work in forensic testing at Lifecodes and to do statistical analyses. According to him, the testing was done in accordance with Lifecodes’ protocol. Four polymorphic probes were used and where, as here, there appear to be migrational differences in the bands on the gel, monomorphic probes are utilized to assess whether there are similar migrational differences on these probes since it is known where the monomorphic bands should appear.
The rate of migration may be affected by the salt concentration in the gel, by the amount of DNA in the sample, and by environmental insults.
Dr. McElfresh testified that there was band shifting here, that the bands were not aligned exactly and that this is a common phenomenon. By applying a monomorphic probe to bring the match window to 1.8%, a match was declared.
According to Dr. McElfresh, Lifecodes is the only laboratory that routinely uses monomorphic probes to correct for migrational differences. If Lifecodes had used the monomorphic probe closest to the diagnostic probe, the 1.8% match window would not have been achieved. This was the first time that the closest monomorphic probe was not employed. In any event, without using monomorphic probes, many of the bands would have been outside the 1.8% match window.
The witness further testified that Lifecodes’ method is generally accepted in the molecular science community, and the use of monomorphic probes is standard procedure.
With respect to the population studies, Dr. McElfresh testi *116 fied that subcultures would make no significant difference in the data base. Even if there were population differences, they would be small or nonexistent.
Dr. Devlin, the People’s population geneticist and statistician, testified that he was familiar with Lifecodes and the work done on this case. He has concentrated his own work and his peer review papers in the areas of population genetics and statistics. According to him, increasing the group — or sample — size does not significantly change the calculations in determining probabilities. While he agreed that the data base should be from a single population, recognizing substructures in populations, the mixing of populations does not change the results to any significant extent. It was his opinion that Lifecodes’ data base for Blacks, Caucasians and Hispanics is a very good sample of the United States population.
He testified that Lifecodes was the only laboratory that corrected for band shift.
Dr. D’Eustachio, defense expert in molecular biology and genetics, testified that Lifecodes’ method of correcting for band shift by using monomorphic probes was not generally accepted as reliable among molecular geneticists. First, there were an insufficient number of monomorphic bands utilized to detect and measure the shifts in the areas close to the diagnostic bands in question. This is important because the different regions of the gel shift unpredictably and unequally. Furthermore, not enough material has been published about band shifting, let alone "correcting” for band shift. He said that Lifecodes’ increased migration paper (discussed below) is but one paper, which introduces an argument and a limited body of data. It was his opinion that the method must be tested under more than one set of circumstances and over a substantial period of time before it can be declared to be generally accepted as reliable.
The witness further testified that the use of monomorphic probes to detect for band shift is well accepted in the scientific community. He stressed the importance of obtaining the expected pattern in the control lane when using a monomorphic probe to correct for band shift, which did not occur here. In two of the three bands generated by the monomorphic probe (PAC 406) the percentage shift was in excess of Lifecodes’ 1.8% size measurement error rule (quantitative match rule). He said that the shift in this case was extreme and unpredict *117 able within a small range of the gel and that consequently no data can be used from hybridizations where, as here, the control has failed.
It was Dr. D’Eustachio’s testimony that Lifecodes disregarded its own previously promulgated match rule by not using the monomorphic band closest to the diagnostic band, and that such a practice is not scientifically acceptable.
Dr. Shields, defense expert in the fields of molecular and population genetics and statistics, testified regarding the general acceptance of Lifecodes’ methods of declaring a match. It was his understanding, after having read Lifecodes’ literature regarding the use of monomorphic probes to detect for band shift, that the monomorphic probe closest to the polymorphic probe was to be used for the correction. Lifecodes did not follow this rule in the present case. Had Lifecodes employed the closest monomorphic probe for this purpose, it would not have been within its 1.8% match window and a match would not have been declared.
According to Dr. Shields, Lifecodes’ use of monomorphic probes to correct for band shift is not generally accepted in the scientific community. It is the only laboratory that does so. Also, the failure to utilize the closest monomorphic probe constitutes a deviation from Lifecodes’ own previously promulgated quantitative match rule. The community of molecular geneticists would find this scientifically unacceptable.
Furthermore, he testified, the choice of using the closest monomorphic probe is not random. In concurrence with Dr. D’Eustachio’s testimony, Dr. Shields explained that different regions of the gel shift unpredictably and unequally and that in order to properly analyze the results the probe used must be from the same general region of the gel. Using a different probe is not generally acceptable in the scientific community.
With respect to population genetics, Dr. Shields testified that there is a split in the scientific community regarding the statistical significance of including the effect of population substructure in calculating probabilities of obtaining a given DNA pattern. He opined that Lifecodes’ methodology, which does not account for population substructure in its calculations, would produce more deceiving results and, therefore, would not be the preferred method.
Of the many exhibits admitted into evidence, several were particularly significant to the issues considered by the court. *118 Lifecodes’ "Increased Migration” peer-reviewed paper[8] discussed, for the first time, its use of monomorphic probes to correct for band shift. Dr. McElfresh acknowledged that in the examples referred to in the paper, and in 50 experiments that served as the basis for the finding that monomorphic probes corrected for band shift, Lifecodes used bands from the monomorphic probe that were closest to the diagnostic probe to correct for band shift.
On the issue of what data base should be used to make statistical estimates of the probability of a match, the defense relied upon the view set forth in an article by two prominent population geneticists.[9] The thrust of the article is that there are genetic substructures within various human populations (i.e., ethnic subgroups) that are relevant in forensic situations. Thus, any population studies of broad racial groups that do not include information of gene frequency distribution in subgroups are unreliable.
However, the People’s witness, Dr. Devlin, testified that even considering substructures, they would have no effect upon Lifecodes’ population estimates. His articles on the subject were part of the record.
As this lengthy hearing was drawing to a close, the National Research Council (hereinafter referred to as NRC) of the National Academy of Sciences released its report addressing questions about the reliability of DNA typing, methodological standards, and the interpretation of population statistics.
FINDINGS OF FACT
The use of monomorphic probes is common in DNA typing to detect for the existence of band shift.
Lifecodes is the only forensic laboratory that employs monomorphic probes to correct for band shift.
Although no mention is made in its protocol regarding the use of a monomorphic probe closest to the diagnostic probe to correct for band shift, in all the experiments referred to in Lifecodes’ "Increased Migration” paper, such a procedure was *119 always followed. It was not followed in this case, apparently for the first time.
The control for one of the probes used by Lifecodes to correct for band shift failed to generate the expected band pattern in two of three locations, as a result of which the bands fell outside of Lifecodes’ quantitative match rule.
Lifecodes did not consider subpopulations in its statistical estimates.
CONCLUSIONS OF LAW
The report of the NEC directly addresses the problem of utilizing monomorphic probes to correct for band shift. "Testing for band shifting is easy, but correcting it is harder * * * Little has been published on the nature of band shifting, on the number of monomorphic internal control bands needed for reliable correction, and on the accuracy and reproducibility of measurements made with such correction. For the present, several laboratories have decided against attempting quantitative corrections; samples that lie outside the match criterion because of apparent band shifting are declared to be 'inconclusive.’ The committee urges further study of the problems associated with band shifting. Until testing laboratories have published adequate studies on the accuracy and reliability of such corrections, we recommend that they adopt the policy of declaring samples that show apparent band shifting to be 'inconclusive.’ ” (emphasis supplied; NRC Report, DNA Technology in Forensic Science, at 2-11 [1992].)
The People’s witnesses and defendant’s witnesses were in complete disagreement on whether correcting for band shift by using monomorphic probes was generally accepted in the molecular genetics community.
The fact that Lifecodes was the only forensic laboratory engaged in the practice is significant.
The report of the NEC is of greater impact on the issue.
While the DNA principle and EFLP analysis are generally accepted in the scientific community, this court cannot find that the practice of using monomorphic probes to correct for band shift is a generally accepted test among molecular geneticists.
DNA profiling still comes under the category of novel scientific evidence, even though one appellate court in this State *120 has finally considered its admissibility in criminal cases.[10] Thus, at this stage of the DNA forensic experience it would be judicial foolhardiness to submit the issue of whether Lifecodes performed scientifically accepted tests to the jury to determine the weight of such evidence. This is especially so when the scientific community itself recommends that band-shifting results be declared inconclusive until testing laboratories have published adequate studies on the accuracy and reliability of monomorphic corrections.
If scientists have reservations the courts should exercise restraint in moving in.
Therefore, the "threshold of reliability necessary to permit” admission of DNA evidence at trial has not been reached in this case (see, People v Wesley, supra). Under the circumstances, this court does not believe that whether Lifecodes followed accepted procedures here is merely an ancillary issue that speaks to the weight of the evidence (see, People v Wesley, supra).
This court is not persuaded by the People’s reliance on People v Booker (Sup Ct, Queens County, Aug. 28, 1990) and Caldwell v State (260 Ga 278, 393 SE2d 436, supra), both Lifecodes band-shift cases, in which DNA typing evidence was ruled admissible at trial. Neither case is controlling here. [11]
This court further finds that by failing to use a monomorphic probe closest to the diagnostic probe to correct for band shift and in experiencing a failure in its control, Life- *121 codes neither followed its own method nor obtained a reliable result.
Accordingly, this court concludes that Lifecodes did not substantially perform scientifically accepted tests and techniques did not achieve scientifically reliable results.
Therefore, proof of DNA typing will not be admitted into evidence during the trial of this action.
In view of the foregoing, the court does not reach the issue of Lifecodes’ methodology in calculating statistical estimates.[12]
[Portions of opinion omitted for purposes of publication.]

. Last week this subject was addressed for the first time by a New York appellate court (People v Wesley, 183 AD2d 75 [3d Dept 1992], affg 140 Misc *109 2d 306); until then, only a handful of trial courts in this State had rendered written decisions on the admissibility of this type of forensic testing (see, People v Wesley, supra; People v Lopez, NYLJ, Jan. 6, 1989, at 29, col 1 [Sup Ct, Queens County]; People v Castro, 144 Misc 2d 956 [Sup Ct, Bronx County]; People v Gonzalez, NYLJ, Aug. 18, 1989, at 22, col 2 [Suffolk County Ct]; People v Huang, 145 Misc 2d 513 [Nassau County Ct]; People v Golub, NYLJ, May 21,1990, at 33, col 4 [Nassau County Ct]; People v Mohit, 153 Misc 2d 22 [Westchester County Ct]; People v Rivera, NYLJ, June 19, 1992, at 26, col 1 [Suffolk County Ct]).

. The admissibility of novel scientific evidence in New York is considered in a Frye hearing (see, People v Hughes, 59 NY2d 523).

. Since this court held in its order dated August 27, 1990 that the reliability of DNA forensic identification techniques and the scientific principle underlying them were generally accepted in the scientific community and were found to be such in our courts (see, n 1), those issues were not required to be addressed anew at this hearing.

. Frye hearings have been held in almost all States. Admissibility hearings have been held in Federal courts under rule 702 of the Federal Rules of Evidence. Appellate review is somewhat limited (In re Perry v State, 586 So 2d 242 [Ala]; Prater v State, 307 Ark 180, 820 SW2d 429; People v Axell, 235 Cal App 3d 836, 1 Cal Rptr 2d 411; People v Fishback, 829 P2d 489 [Colo]; Martinez v State, 549 So 2d 694 [Fla]; Caldwell v State, 260 Ga 278, 393 SE2d 436; People v Lipscomb, 215 Ill App 3d 413, 574 NE2d 1345; State v Brown, 470 NW2d 30 [Iowa]; Smith v Deppish, 248 Kan 217, 807 P2d 144; Cobey v State, 80 Md App 31, 559 A2d 391; Commonwealth v Curnin, 409 Mass 218, 565 NE2d 440; State v Schwartz, 447 NW2d 422 [Minn]; State v Pennington, 327 NC 89, 393 SE2d 847; State v Ford, 301 SC 485, 392 SE2d 781; Mandujano v Texas, 799 SW2d 318 [Tex]; Spencer v Commonwealth, 238 Va 295, 384 SE2d 785; State v Woodall, 182 W Va 15, 385 SE2d 253; United States v Jakobetz, 955 F2d 786 [2d Cir]; United States v Two Bulls, 918 F2d 56 [8th Cir]).

. On April 16, 1992, the National Research Council of the National *110 Academy of Sciences published its report, DNA Technology in Forensic Science, following a study that began in January 1990 to examine issues regarding the reliability of DNA typing methodological standards and interpretation of population statistics as they relate to forensic use.

. Restriction fragment length polymorphisms.

. Prong II under Castro (supra) created controversy by referring to a generally accepted scientific technique, as opposed to a generally accepted scientific technique employed in the specific case. That portion of the decision was criticized (Note, The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant, 42 Stan L Rev 465, 506 [1990]). Nevertheless, as courts have begun to deal with the DNA issue, considerable reliance has been placed upon the Castro legal analysis, and its three-prong approach seems to have been followed (People v Fishback, 829 P2d 489 [Colo], supra; Smith v Deppish, 248 Kan 217, 807 P2d 144, supra; United States v Two Bulls, 918 F2d 56 [8th Cir], supra). This court chose that approach as well.

. McNally, Baird, McElfresh, Eisenberg & Balazs, Increased Migration Rate Observed in DNA From Evidentiary Material Precludes the Use of Sample Mixing to Resolve Forensic Cases of Identity, J of Applied and Theoretical Electrophoresis 267 (1990).

. Lewontin and Hartl, Population Genetics in Forensic DNA Typing, 254 Science 1745 (1991).

. It should be observed that the County Court in Wesley (supra) considered the DNA issue in a Frye hearing on an application to take blood from the defendant. The tests had not been performed at the time of the hearing. It appears from the Appellate Division, Third Department’s recent decision that there were no significant issues raised in the court below that allowed the appellate court to analyze the type of controversial scientific issue raised before this court.

. Booker (supra) involved a Frye hearing in which the court rejected defendant’s limited attack on Lifecodes’ use of monomorphic probes to correct for band shift. The court did not appear to consider the specific issue presented in the case at bar, nor did it make a finding with respect to it, despite the contention of defendant’s expert witness that monomorphic probes had not been established as reliable under the circumstances in which they were used.
In Caldwell (supra), decided by the highest court in Georgia, the Frye standard was not used. A less conservative test for admissibility of novel scientific evidence was applied, allowing the Judge to rule upon admissibility based upon the evidence before the court and not on a consensus in the scientific community (Caldwell v State, 260 Ga 278, 285-287, 393 SE2d 436, 441, supra).

. While it is apparent that there is a distinct division in the population genetics community regarding the manner in which statistical estimates are calculated, as documented by the NEC Report, recent decisions in this State have allowed the submission of the issue to a jury once a match is found (see, People v Wesley, supra; People v Rivera, supra; People v Mohit, supra; People v Huang, supra).