Edward Russell Dubose was convicted of three counts of capital murder. The Court of Criminal Appeals reversed the conviction on the basis that the trial court had unconstitutionally *Page 1191 
denied the defendant's request for funds for a DNA expert to counter the expert DNA evidence offered by the State. We find the statement of facts contained in the opinion of the Court of Criminal Appeals to be correct, and we adopt it here as our own. See Dubose v. State, 662 So.2d 1156 (Ala.Crim.App. 1993).
In its petition and brief to this Court, the State of Alabama raises a number of issues. The State contends that defense counsel in this case was not eligible for reasonable expenses under § 15-12-21, Ala. Code 1975, because Dubose had a $10,000 "defense fund" and because the defense attorney was not "appointed." The State also contends that Dubose is not entitled to expert funds because, it argues, the holding of Akev. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), does not extend beyond its application to psychiatric experts. The State also contends that Dubose's request for expert funds was not timely. Finally, the State contends that Dubose failed to make an adequate showing of a need for expert services.
We agree with the holding of the Court of Criminal Appeals with regard to the first issue as to whether Dubose was eligible for reasonable expenses under § 15-12-21, Ala. Code 1975. In Ex parte Sanders, 612 So.2d 1199 (Ala. 1993), the defendant was found at his arraignment to be indigent, and the court appointed counsel to represent him. Two weeks later, the defendant's family retained counsel to represent him and the appointed counsel withdrew. Before trial, Sanders asked the court to approve funds to pay for a ballistics expert. The trial court denied the motion for funds to pay the expert, stating, "[Y]ou have got retained counsel, and I am not going to provide funds to do that." Sanders at 1200. In holding that it was error for the trial court to deny Sanders's request for a ballistics expert on a finding that he was not indigent, this Court stated:
 "Section 15-12-1 defines an indigent defendant [as] '[a]ny person involved in a criminal or juvenile proceeding in the trial or appellate courts of the state for which proceeding representation by counsel is constitutionally required and who under oath or affirmation states that he is unable to pay for his defense and who is found by the court to be financially unable to pay for his defense.' Section 15-12-21(d) provides that 'Counsel [appointed to defend an indigent defendant] shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court. . . .'
". . . .
 "The criteria for determining indigency are set out in § 15-12-5(b):
 " 'In determining indigency, the judge shall recognize ability to pay as a variable depending on the nature, extent and liquidity of assets, the disposable net income of the defendant, the nature of the offense, the effort and skill required to gather the pertinent information and the length and complexity of the proceedings.'
 "We agree with the holding of the Court of Criminal Appeals in Russaw v. State, 572 So.2d 1288
(Ala.Cr.App. 1990), that the assets of friends and relatives, not legally responsible for the defendant, are not included within the 'assets' referred to in § 15-12-5(b).
 " 'This is in accord with the general rule that "the earnings or property of various persons other than the accused, but in some way related to him, [should] not be considered in determining his indigency, the test being the personal means of the accused." Annot., 51 A.L.R.3d 1108, § 4 (1973). "[T]he court must look only to the defendant's own earnings and assets, disregarding the potential assistance of friends and relatives who have no obligation to support the defendant." 2 W. LaFave and J. Israel, Criminal Procedure § 11.2(e) at 28 (1984).'
"572 So.2d at 1295.
 "If the assets of friends and relatives who are not legally responsible for the defendant are not included in determining a defendant's indigency, then the fact that a friend or relative pays for an indigent defendant's counsel should not be considered in determining whether the defendant is entitled to funds for expert assistance. *Page 1192 
The simple fact that the defendant's family, with no legal duty to do so, retained counsel for the defendant, does not bar the defendant from obtaining funds for expert assistance when the defendant shows that the expert assistance is necessary."
612 So.2d at 1200-01.
With the foregoing principles in mind, we hold that Dubose's motion for indigent status should have been granted by the trial court. The State argues that the trial court correctly denied Dubose's motion to be certified as indigent because, it says, a $10,000 "defense fund" existed at the outset of the criminal proceedings against Dubose. However, the defense fund had a balance of only $27.00 when Dubose asked to be certified as indigent. The original $10,000 consisted entirely of contributions from friends and relatives not legally responsible for Dubose's defense. Dubose's wife and children were on public assistance, Dubose had no income, and his wife was unemployed. He and his wife had no property other than a 1980 Chevrolet automobile "worth about $600" and a mobile home on which they had a $200 monthly mortgage payment; the mobile home was located on real estate owned by his wife's parents. The trial court certified Dubose as indigent for purposes of appeal, on the same evidence of indigence.
The State argues that, because § 15-12-21(d) speaks in terms of counsel who has been appointed, an indigent defendant represented by retained counsel cannot be entitled to state assistance for trial preparation essential to assuring the defendant's right to a fair trial. However, this Court inSanders saw no conflict between § 15-12-21(d) and the requirement that a defendant be provided with funding for expert assistance vital to the defense. Sanders at 1200.
We turn then, to the issue whether Dubose should have been provided an expert on DNA to counter the DNA evidence offered by the State. The State argues that Ake v. Oklahoma,470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), does not extend beyond its application to psychiatric assistance.
In Ake v. Oklahoma, the issue was whether an apparently insane indigent had the right of access to a psychiatrist to determine his sanity at the time of the alleged offense. The Supreme Court concluded that the Due Process Clause guarantee of fundamental fairness is implicated "when [an indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial" and that "the State must, at minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Ake, 470 U.S. at 83,105 S.Ct. at 1096. We note that the Supreme Court's decision in Ake
dealt specifically with psychiatric experts.
In Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633,86 L.Ed.2d 231 (1985), the Supreme Court found "no need to determine as a matter of federal constitutional law what, if any, showing would have entitled a defendant to assistance of the type there sought [a criminal investigator, a fingerprint expert, and a ballistics expert]," given that "[the] petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial." Caldwell,472 U.S. at 324 n. 1, 105 S.Ct. at 2637 n. 1.
Ake and Caldwell, taken together, hold that a defendant, to be entitled to funds to pay for an expert, must show more than a mere possibility of assistance from an expert. Rather, the defendant must show a reasonable probability that an expert would aid in his defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial.Moore v. Kemp, 809 F.2d 702, 712 (11th Cir.), cert. denied,481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). Neither case limits the application of the Ake principle to a psychiatrist, nor have our cases interpreting Ake specifically ruled that the holding of Ake was limited to cases involving a psychiatrist.
In the past, Alabama decisions denying expert assistance have been based upon a finding that the defendant did not make an adequate showing of a need for the requested expert. SeeSmith v. State, 623 So.2d 369 (Ala.Cr.App. 1992), cert. denied,
 *Page 1193 
___ U.S. ___, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993) (juvenile not entitled to independent testing of a shotgun when the testing was not shown to be critical to the defense); Dill v. State,600 So.2d 343, aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) (defendant made no showing of need for assistance of psychiatrist; no error in court's failure to appoint private investigator);McLeod v. State, 581 So.2d 1144 (Ala.Cr.App. 1990) (defendant not entitled to appointment of an investigator to assist in preparing defense, absent specific reasons demonstrating necessity for investigator); Siebert v. State, 562 So.2d 586, aff'd, 562 So.2d 600 (Ala. 1990), cert. denied, 498 U.S. 963,111 S.Ct. 398, 112 L.Ed.2d 408 (1990) (denial of motion for appointment of expert to assist in preparing motion for a change of venue is proper where defendant "has not shown a need for such expert"); Stewart v. State, 562 So.2d 1365
(Ala.Cr.App. 1989) (appellant failed to make a significant preliminary showing of insanity to be entitled to psychiatric assistance); McGahee v. State, 554 So.2d 454, aff'd,554 So.2d 473 (Ala. 1989) (no specific request for doctor to be appointed as expert, and defense counsel "offered little more than undeveloped assertions" that an expert was necessary); Davis v.State, 549 So.2d 577 (Ala.Cr.App. 1989) (semen test "not necessary to guarantee an adequate defense"); Garth v. State,536 So.2d 173 (Ala.Cr.App. 1988) (expert on "home race bias" was not necessary for defendant's defense); Nelson v. State,511 So.2d 225, aff'd, 511 So.2d 248 (Ala. 1987), cert. denied,486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988) (no showing that investigators, psychiatric evaluation, or expert witnesses were necessary for an adequate defense); Duren v. State,507 So.2d 111, aff'd, 507 So.2d 121 (Ala. 1987), cert. denied,484 U.S. 905, 108 S.Ct. 249, 98 L.Ed.2d 206 (1987) (defendant not entitled to a polling expert, a jury selection expert, or an expert on death-qualified juries, a psychologist and psychiatrists and a presentence investigation expert, because of insufficient showing of need and because defendant offered only the "undeveloped assertions that the requested assistance would be beneficial"); Tarver v. State, 500 So.2d 1232, aff'd,500 So.2d 1256 (Ala. 1986), cert. denied, 482 U.S. 920,107 S.Ct. 3197, 96 L.Ed.2d 685 (1987) (defendant made no "showing of the need for a forensic expert" to examine fingerprints on a beer can); Hold v. State, 485 So.2d 801 (Ala.Cr.App. 1986) (where defendant failed to make showing of need for private investigator, trial court's denial of defendant's request for funds to hire private investigator did not violate defendant's due process rights). Like Caldwell, each of these cases holds only that a defendant failed to make a showing sufficient to establish a deprivation of due process. See 472 U.S. at 323 n. 1, 105 S.Ct. at 2637 n. 1.
In Ex parte Sanders, supra, this Court endorsed the principle that an indigent's entitlement to expert assistance is not limited to psychiatrists. In Sanders, this Court held that it would have been error for the trial court to deny funds to an indigent defendant for a ballistics expert to examine an automobile dashboard — although on the specific facts the error was deemed harmless because the dashboard no longer existed.
In a recent case, the Court of Appeals of Virginia, in holding that the Commonwealth was required to provide an indigent defendant the assistance of a DNA expert, adopted the following reasoning:
 "There is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of science or expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given."
Husske v. Commonwealth, 19 Va. App. 30, 36, 448 S.E.2d 331, 335
(1994), quoting Little v. Armontrout, 835 F.2d 1240, 1243 (8th Cir. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857,101 L.Ed.2d 894 (1988).
Other jurisdictions have expanded the principles inAke beyond psychiatric assistance. Polk v. State, 612 So.2d 381
(Miss. 1992) (applying reasoning of Ake to hold that due process considerations require defendant to have access to a DNA expert); State v. Bridges, 325 N.C. 529, 385 S.E.2d 337
(1989) (fingerprint expert); State v. Moore, 321 N.C. 327,364 S.E.2d 648 (1988) (fingerprint *Page 1194 
identification expert appointed where charge against mentally retarded, indigent defendant was based primarily on palm print found at scene of crime); State v. Coker, 412 N.W.2d 589 (Iowa 1987) (defendant entitled to expert on intoxification where defendant's criminal responsibility at time of offense was significant trial issue); Little v. Armontrout, 835 F.2d 1240
(8th Cir. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857,101 L.Ed.2d 894 (1988) (hypnosis expert); Thornton v. State,255 Ga. 434, 339 S.E.2d 240 (1986) (allowed appointment of dental expert where impressions of defendant's teeth were the only connecting link between the defendant and the homicide, and impressions were subject to varying expert opinions). See also Washington v. State, 800 P.2d 252, 253-54
(Okla.Crim.App. 1990) (noting that the Supreme Court's decision in Ake v.Oklahoma "did not preclude the possibility that the principles of Ake should be extended to any [necessary] expert," the court remanded for an evidentiary hearing to determine whether a forensic odontologist and a chemist were required as "basic tools" of defense, so that the State would be required to fund these experts).
Accordingly, we conclude that the principles enunciated inAke, and grounded in the due process guarantee of fundamental fairness, apply in a case of nonpsychiatric expert assistance when an indigent defendant makes a proper showing that the requested assistance is needed for him to have "a fair opportunity to present his defense." 470 U.S. at 76,105 S.Ct. at 1092. We now must address the State's contention that Dubose's request for funds to pay for an expert was not timely.
The record reflects that on December 30, 1988, three days after Dubose was arrested, defense counsel was aware that the State intended to use DNA testing; however, counsel did not request funds for an expert until August 24, 1989, almost nine months after the arrest. The State relies on this fact to support its contention that the motion for funds was untimely. We agree with the Court of Criminal Appeals that "the procedural facts of this case do not lend themselves to such a simple interpretation." 662 So.2d at 1182.
On December 30, 1988, three days after Dubose's arrest, defense requested copies of any reports prepared by the State's experts and copies of all records and reports regarding the results of any medical, laboratory, forensic, or scientific examination or analysis. Defense counsel also filed a motion to inspect, examine, and test physical evidence. In January 1989, defense counsel informed the trial court and the prosecution that he would not hire any experts until he had received the prosecution's test results.
In February 1989, the trial court granted Dubose's discovery motion and ordered the State to notify defense counsel of the conditions under which the remaining vaginal swabs and other materials relating to the State's DNA evidence could be obtained.
The defense did not receive the report from Lifecodes Corporation with the DNA test results until sometime after May 17, 1989, the date of the report. The State did not produce the autorads and lab notes relating to those test results until January 11, 1990. The vaginal swabs were not produced until February 7, 1990. The computer sizings and the updated report from Lifecodes were not produced until February 12, 1990.
We agree with the Court of Criminal Appeals that it was reasonable for defense counsel to wait for the prosecution's results before seeking expert assistance to aid in Dubose's defense. The prosecution's DNA results could have been exculpatory or inconclusive, thereby eliminating the need for a defense expert. Until the autorads, laboratory notes, and other data were available to the defense, there was little, if any, assistance that an expert could have provided. Therefore, we hold that the appellant's request for expert funds was timely.
We next address whether Dubose made an adequate showing that expert assistance was necessary. The only time a defendant in Alabama, whether indigent or not, has a right to have an independent expert examine physical evidence is when such evidence (1) is "critical" and (2) is subject to varying expert opinions. Sanders, supra. To be "critical," the evidence must be the only evidence linking the accused with the *Page 1195 
crime or proving an element of the corpus delicti. Even if the evidence is indeed critical, it is not subject to independent examination unless it is also subject to varying expert opinions. Sanders, supra.
Beginning with the introduction of the method in a research setting in 1985 and with the first criminal case that was granted appellate review in 1988,[1] the role of DNA analysis in criminal investigations and trials has remained controversial. See Ricardo Fontg, Comment, DNA Fingerprinting: A Guide toAdmissibility and Use, 57 Mo.L.Rev. 502 (1992). While some experts find DNA analysis an accurate method of identification, other experts find it less useful, if not unreliable, during investigation and trials. See People v. Castro, 144 Misc.2d 956,545 N.Y.S.2d 985 (N.Y. Sup. Ct. 1989); State v. Schwartz,447 N.W.2d 422 (Minn. 1989); Commonwealth v. Curnin,409 Mass. 218, 565 N.E.2d 440 (1991); People v. Keene, 156 Misc.2d 108,591 N.Y.S.2d 733 (N.Y. Sup. Ct. 1992); Commonwealth v.Lanigan, 413 Mass. 154, 596 N.E.2d 311 (1992).
This Court has described the procedure for evaluating DNA; inEx parte Perry, 586 So.2d 242, 247 (Ala. 1991), we wrote (quoting Schwartz, supra, 447 N.W.2d at 425):
 " 'Three commercial laboratories in the United States currently perform DNA analysis: Cellmark . . .[,] Lifecodes Corporation,[2] and Cetus Corporation. Both Cellmark and Lifecodes employ restriction fragment length polymorphism (RFLP) analysis in their DNA testing. RFLP analysis involves the following steps:
 " '(1) Extraction: DNA is removed from the specimen and "washed" with an organic solvent.
 " '(2) Fragmentation: the extracted DNA chain is then cut into fragments at specific sites by mixing it with a restriction enzyme.
 " '(3) Gel electrophoresis: the DNA is placed in a gel to which an electrical current is applied, causing separation of the fragments into bands according to their length.
 " '(4) Southern [transfer]: the DNA bands are transferred to a nylon membrane while retaining the same positions they previously occupied on the gel. The double-stranded bands are then treated with a chemical that causes them to separate into single strands.
 " '(5) Hybridization: genetic probes (DNA clones) are applied, which bind to a specific, complementary DNA sequence on the membrane; the excess probe is then washed off.
 " '(6) Autoradiograph (or "autorads"): the membrane is exposed to an x-ray film and developed so that the DNA banding patterns and their lengths can be visualized. Finally, the autoradiograph is interpreted by comparing the DNA print to another DNA sample to determine if they match based on band length.' "
In Perry, recognizing that "there remains the possibility for error in the interpretation and performance of the [DNA] tests" (586 So.2d at 249), this Court advocated a modified Frye[3] test to determine whether DNA test results may be received into evidence:
 "I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results?
 "II. Are there current techniques that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community?
 "III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests?"
Perry, 586 So.2d at 250.
Considering both the record in Perry and the holdings of other courts that had addressed *Page 1196 
the issue, we held that "there is a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results" — thus, prong one was satisfied. Id.
We also held that "there are current techniques that are capable of producing reliable results in DNA 'matching' and that are generally accepted in the scientific community" — thus, prong two was satisfied. Id. Therefore, challenges to DNA evidence are most likely to be asserted under the third prong of the test.
In order to answer the question addressed in prong three, we must answer two inquiries:
 "First, were the techniques used by the testing laboratory generally accepted in the scientific community? Second, was there error in the performance and interpretation of the tests?"
Perry, 586 So.2d at 250.
Perry outlines procedures available to the defendant for challenging, under the third prong, the techniques, performance, and interpretation of DNA tests:
 "1. The proponent of the DNA evidence, whether defense or prosecution, should give discovery to the adversary, which should include, upon request: (1) Copies of autorads, with the opportunity to examine the originals. (2) Copies of laboratory books. (3) Copies of quality control tests run on material utilized. (4) Copies of reports by the testing laboratory issued to the proponent. (5) A written report by the testing laboratory setting forth the method used to declare a match or non-match, with actual size measurements, and mean or average size measurement, if applicable, together with standard deviation used. (6) A statement setting forth observed contaminants, the reasons therefor, and tests performed to determine the origin and the effects thereof. (7) If the sample is degraded, a statement setting forth the tests performed and the results thereof. (8) A statement setting forth any other observed defects or laboratory errors, the reasons therefor and the effects thereof. (9) Chain of custody documents. (10) A statement by the testing lab, setting forth the method used to calculate the allele frequency in the relevant population. (11) A copy of the data pool for each loci examined. (12) A certification by the testing lab that the same rule used to declare a match was used to determine the allele frequency in the population. (Note that the discovery provisions in (10), (11), and (12) specifically address evidence of DNA population frequency statistics.)
 "2. The proponent shall have the burden of going forward to establish that the tests and calculations were properly conducted. Once this burden is met, the burden of proof shifts to the adversary to prove, by a preponderance of the evidence, that the tests and calculations should be suppressed or modified."
Perry, 586 So.2d at 255.
Given the complexity of DNA technology, it is doubtful that a defense attorney will have the requisite knowledge to effectively examine autorads, laboratory books, quality control tests, copies of reports by the testing labs, standard deviations, contaminants, etc., without expert assistance. Normally, two kinds of experts testify for the prosecution as to the reliability of DNA tests: Molecular biologists from the laboratories that perform the DNA test, and molecular biologists from the academic community. Laboratory molecular biologists, who are familiar with the laboratory facilities, testify as to the type of DNA test used on the sample and testing standards. Molecular biologists from the academic community testify as to whether forensic laboratory procedures are accepted in the general scientific community. See Ricardo Fontg, Comment, DNA Fingerprinting: A Guide to Admissibilityand Use, supra, 528-29.
Given the complex nature of the DNA testing process, coupled with the extraordinarily high numbers used in the statistics quoted in court, jurors may well be overwhelmed by such powerful identification evidence. Ricardo Fontg, Comment,DNA Fingerprinting: A Guide to Admissibility and Use, supra, 519-20. DNA analysis and the resulting statistics can be extremely convincing evidence to jurors who have heard hours *Page 1197 
of expert testimony and statistics regarding the improbability of misidentification or other errors in the procedure.Id. See Andrews v. State, 533 So.2d 841, (Fla. Dist. Ct. App. 1988), cert. denied, 542 So.2d 1332 (Fla. 1989) (prosecution's expert stated the chance that DNA strands found in appellant's blood would be duplicated in some other person's cells as 1 in 839,914,540);[4] People v. Fishback, 829 P.2d 489,491 (Colo.App. 1991) (DNA expert stated that "[t]he DNA bands are a match" and "[t]hat's not up for interpretation"; that the DNA testing process was "failsafe"; and that there was only one chance in 830,000,000 that someone other than the defendant would match the DNA samples).[5] Recognizing that DNA statistical evidence can create a "potentially exaggerated impact on the trier of fact," this Court in Perry wrote:
 "We are concerned that the [DNA population frequency evidence] unduly encourages the trier of fact in its determination of whether the State has proven guilt beyond a reasonable doubt to focus solely upon a numerical conclusion and to disregard the weight of other evidence."
Perry, 586 So.2d at 254 (citations omitted). Given the weight that a jury could place on DNA tests and the statistics drawn from them, coupled with the unlikelihood that defense counsel will have the expertise to challenge that evidence, we hold that an indigent defendant against whom DNA evidence will be offered must have access to a DNA expert to assist in his defense.
While defense counsel is obligated to inform himself about the scientific area in question, we also recognize that defense counsel may be unfamiliar with specific scientific theories implicated in a case and therefore unable to provide the court with the detailed analysis the appointed expert might provide. Plus, defense counsel cannot testify in front of the jury and otherwise has the sole remedy of questioning the prosecution's expert, who is unlikely to give testimony unfavorable to himself or his processes. See Ricardo Fontg, Comment, DNAFingerprinting: A Guide to Admissibility and Use, supra, 529 (DNA experts "have intimate connections with the laboratories and financial interests in the DNA tests, and often their careers are built on the success of the tests and the admissibility of test results") See also, Christopher G. Shank, Note, DNA Evidence in Criminal Trials: Modifying the Law'sApproach to protect the Accused from Prejudicial GeneticEvidence, 34 Ariz.L.Rev. 829, 852 (1992) ("Courts applying theFrye doctrine must also be alert to the authorities who are alone in the field and validate their own work, sometimes in the face of strong scientific criticism."); William C. Thompson and Simon Ford, DNA Testing: Acceptance and Weight of the NewGenetic Identification Tests, 75 Va.L.Rev. 45, 103 (1989) ("an employee of Lifecodes, which stands to profit if their technique is quickly ruled admissible, . . . may not be 'disinterested and impartial' "). In Perry, supra, this Court noted that two Lifecodes scientists, testifying as expert witnesses for the State, had "an obvious interest in validating Lifecodes' techniques." Perry, at 251.
In Polk v. State, 612 So.2d 381 (Miss. 1992), the Mississippi Supreme Court decided whether DNA evidence used to identify the defendant as the perpetrator of a crime was admissible in Mississippi. In holding that DNA evidence was admissible, the court adopted the three-pronged test for admissibility set forth in Ex parte Perry, supra, and added the following:
 "It is also imperative that no defendant have [DNA] evidence admitted against him without the benefit of an independent expert witness to evaluate the data on his behalf. In Ake v. Oklahoma, the U.S. Supreme Court pointed out, when the State made a defendant's mental condition an issue in their case, [that] the assistance of a psychiatrist could be crucial to the defendant's ability to defend himself. The Court continued,
 " '[P]sychiatrists gather facts . . .; they analyze the information gathered and from it draw plausible conclusions. . . . They know the probative questions to ask of the opposing party's *Page 1198 
psychiatrists and how to interpret their answers. . . . Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. . . .'
 "Employing like reasoning in this present state of the DNA testing technology, we find that due process considerations require that a defendant have access to an independent expert. This does not mean that a defendant has a right to choose whomever he pleases, at whatever costs. Rather, a defendant must only be allowed reasonable funds for access to an expert who can independently evaluate the evidence presented against him by the State, analyze it, and present that analysis at trial."
Polk, 612 So.2d at 393-94 (citations omitted).
In Husske v. Commonwealth, 19 Va. App. 30, 448 S.E.2d 331
(1994), an indigent rape defendant moved before and during trial for the appointment of an expert in DNA analysis to counter the Commonwealth's expert testimony concerning DNA. The trial judge refused to appoint such an expert, but before trial he appointed as co-counsel for the defendant a second attorney who was represented to be "the most knowledgeable member of the local bar in the area of forensic DNA application." The trial judge stated that he had no authority to appoint expert assistance for the defendant. The Court of Appeals of Virginia reversed, holding:
 "Defense counsel must have access to adequate expert assistance, even when the admissibility of the results of analytical techniques is not in question, because there is still a need to review the quality of the laboratory work and the interpretation of results. When the prosecution proposes to use DNA typing evidence or when it has been used in the investigation of the case, an expert should be routinely available to the defendant. If necessary, he or she should be able to apply for funds early in the discovery stages to retain experts without a showing of relevance that might reveal trial strategy. Whenever possible, a portion of the DNA sample should be preserved for independent analysis by the defense."
19 Va. App. at 45-46, 448 S.E.2d at 340, quoting, Report of the Committee on DNA Technology in Forensic Science, National Research Council, DNA Technology in Forensic Science, (National Academy Press, April 1992). See also Ricardo Fontg, Comment,DNA Fingerprinting: A Guide to Admissibility and Use, supra, 547 (the right to expert services is "perhaps the most crucial component to forestall the introduction of unreliable scientific evidence as complex and as technical as DNA analysis"); Christopher G. Shank, Note, DNA Evidence inCriminal Trials: Modifying the Law's Approach to protect theAccused from Prejudicial Genetic Evidence, supra, 867 (expert witnesses are "crucial to assist the defense in establishing an effective cross-examination"); William C. Thompson and Simon Ford, DNA Testing: Acceptance and Weight of the New GeneticIdentification Tests, supra, 147 ("[d]efense counsel must have access to adequate expert assistance, even when the admissibility of the results of analytical techniques is not in question, because there is still a need to review the quality of laboratory work and the interpretation of results"); Paul C. Gianelli, The Admissibility of Novel Scientific Evidence: Fry v. United States, a Half-Century Later, 80 Colum.L.Rev., 1197, 1201, (1980) ("[s]ecuring the services of experts to examine evidence, to advise counsel, and to rebut the prosecution's case is probably the single most critical factor in defending a case in which novel scientific evidence is introduced").
Based on the forgoing authorities, and the facts as stated by the Court of Criminal Appeals, we think it clear that an expert would have aided Dubose in his defense. An expert could have presented the limitations on DNA analysis. This information would have been material for the judge to consider at the admissibility hearing and for the jury to consider at the trial.
At the admissibility hearing, Kevin C. McElfresh, Ph.D, the director of forensics at Lifecodes, testified as to the general acceptance of the DNA test in the scientific community, and he testified that the basic techniques *Page 1199 
of the "Southern transfer" test were used in this case. He also testified that John Coleman, the technician who conducted the specific test, was qualified to perform the test and that the tests were conducted under conditions that would render the results reliable. No evidence was presented that could have shown a mistake in the procedure or in the interpretation of the DNA test.
At trial, the two Lifecodes employees offered expert testimony in which they asserted that they found a "match" between Dubose's DNA and semen samples taken from the body of the victim. McElfresh testified that there was a 1 in 500 million chance that Dubose's particular DNA pattern would appear in the North American black population and, therefore, that "you would expect to find this pattern once and we have found it." Dubose's counsel attempted to impeach the State's expert only by the use of learned treatises, essays, and pamphlets on the subject of DNA.
Without expert assistance, defense counsel had no effective means to refute the testimony of the Lifecodes witnesses. Defense counsel also had no expert witness to independently test the samples, to question whether the DNA results, in fact, showed a "match," or to explain that scientific opinion may be divided on the reliability of DNA testing.
The DNA evidence presented by the State was critical evidence in this case. It was the only evidence that directly linked Dubose to the crime. There were no eyewitnesses to the murder of Stephanie Marie King, nor was there a confession or any other concession of guilt by Dubose. Likewise, there was no evidence regarding the circumstances under which Miss King had left (or had been taken from) the Alco Baptist church before her murder. There was uncertainty in the physical evidence as to whether more than one person might have been involved in her rape and murder. Aside from DNA evidence based on semen samples taken from the body of the victim, the State had no physical evidence or other evidence directly linking Dubose with the attack on Miss King. The State's fingerprint expert acknowledged that the prints found in and on the victim's car could have been there for a matter of months. Dubose testified that he had gotten into Miss King's car a month or more before the murder and that that was the reason the prints were there. Dubose testified at trial as to where he had been on the morning of the killing, and he named a number of people who he said had seen him throughout the morning. Five witnesses corroborated Dubose's alibi testimony.
George Russell testified that on the day of the murder he had seen a white man walking on the dirt road leading out of the woods where the victim's body was found.[6] He further testified that he knew Dubose and had not seen him come out of the woods that day.
We hold that Dubose offered more than "undeveloped assertions that the requested assistance would be beneficial" and that he should have been given an expert to aid in his defense. SeeCaldwell, 472 U.S. at 324 n. 1, 105 S.Ct. at 2637 n. 1. The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, ALMON, HOUSTON, INGRAM, COOK, and BUTTS,* JJ., concur.
[1] Andrews v. State, 533 So.2d 841 (Fla.Dist.Ct.App. 1988),cert. denied, 542 So.2d 1332 (Fla. 1989) (DNA evidence admissible under relevance standard).
[2] Lifecodes performed the DNA testing in the instant case.
[3] In Alabama, whether novel scientific evidence is admissible is determined normally by using the test established in Frye v.United States, 293 F. 1013 (D.C. Cir. 1923). See Ex parte Perry,586 So.2d 242, 247 (Ala. 1991).
[4] No expert witness testified for the defense.
[5] No expert witness testified for the defense.
[6] Dubose is black.
* Although Justice BUTTS was not a member of this Court when the case was orally argued, he has listened to the tape of oral argument and he has studied the record.